**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CARLA PATRICIA DAVILA, *Petitioner*, <br><br> v. <br><br> WILLIAM P. BARR, Attorney General, *Respondent*. | No. 17-72173 <br><br> Agency No. A208-122-961 <br><br> OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted January 21, 2020
San Francisco, California

Filed August 7, 2020

Before: William A. Fletcher and Ryan D. Nelson, Circuit
Judges, and Donald W. Molloy,[*] District Judge.

Opinion by Judge W. Fletcher

---

[*] The Honorable Donald W. Molloy, United States District Judge for
the District of Montana, sitting by designation.

## SUMMARY[**]

### Immigration

Granting Carla Patricia Davila's petition for review of the Board of Immigration Appeals' decision affirming the denial of her applications for asylum, withholding of removal, and protection under the Convention Against Torture, and remanding, the panel held that substantial evidence did not support the Board's determination that Davila failed to establish that the Nicaraguan government was unable or unwilling to protect her from persecution by her domestic partner, or that a public official acting under the color of law had acquiesced to her torture.

Davila reported her partner's abuse to police, who took no action after her partner paid the officers a bribe. The panel held that substantial evidence did not support the Board's determination that Davila failed to establish that the Nicaraguan government was unwilling or unable to protect her from persecution. The panel concluded that the Board erred by requiring Davila to report her abuse again, without considering her reasons for failing to do so, and by faulting her for failing to report the officers' acceptance of the bribe. The panel also concluded that the Board erred by selectively considering country conditions evidence indicating that the Nicaraguan government was making positive strides in combating domestic violence and rape, while failing to take into account other evidence regarding the government's failure to enforce, or lack of effective enforcement of, laws

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

criminalizing rape and domestic violence. The panel observed that the Board did not address whether Davila belonged to a cognizable particular social group, was persecuted on account of her membership in that social group, or had a well-founded fear of future persecution. The panel therefore remanded for the Board to consider those issues in the first instance.

For similar reasons, the panel also held that substantial evidence did not support the Board's determination that Davila failed to establish sufficient state action, or government consent or acquiescence, in any torture. The panel remanded for the Board to consider in the first instance whether Davila's abuse rose to the level of torture, and whether it is more likely than not that she would be tortured upon removal to Nicaragua.

**COUNSEL**

Luther M. Snavely (argued) and Reza Athari, Reza Athari & Associates, Las Vegas, Nevada, for Petitioner.

Michael C. Heyse (argued), Trial Attorney; Mary Jane Candaux, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

W. FLETCHER, Circuit Judge:

Carla Patricia Davila petitions for review of a Board of Immigration Appeals ("BIA") order affirming the denial of her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Davila claims that she suffered frequent and severe abuse at the hands of Ronald Alfredo Cevilla, her domestic partner in Nicaragua. When Davila telephoned to Nicaraguan police to ask for protection from Cevilla's abuse, police officers arrived at the house, took a bribe from Cevilla, and left without speaking to her. The BIA agreed with the Immigration Judge ("IJ") that Davila had not shown that the Nicaraguan government was unable or unwilling to protect her from persecution, or that a public official acting under the color of law had acquiesced to her torture. It did not reach the question of whether Davila had been persecuted on account of her membership in a cognizable particular social group, or whether Davila's abuse amounted to torture.

The BIA's conclusions were not supported by substantial evidence. We therefore grant the petition and remand to allow the BIA to address for the first time the questions it did not reach.

### I. Background

### A. Davila's Testimony

The IJ found credible Davila's removal hearing testimony—a finding that the BIA accepted without qualification. We therefore accept the following facts from

her testimony as true. *See Ming Dai v. Sessions*, 884 F.3d 858, 870 (9th Cir. 2018) ("[W]e are required to treat a petitioner's testimony as credible when the agency does not make an adverse credibility finding . . . .").

Davila is a native and citizen of Nicaragua. In 2006, she entered into a relationship with Cevilla, who manages several hotels owned by his father. After a few months, Davila and her son from a previous relationship, Yadher, moved into Cevilla's house.

Approximately a year into their relationship, Cevilla began abusing Davila. In February 2007, Cevilla returned home late one evening. He was drunk and pounded on the door. Davila, who had been asleep, believed he had his keys and did not immediately get up. When Davila eventually answered the door, Cevilla accused her of hiding another man in the house. He pulled her hair, hit her in the face, threw her to the ground, and beat her in the stomach. Davila protested that she had not done anything wrong. After neighbors, hearing Davila's screams, knocked on the door, Cevilla stopped the abuse and went to bed. The next day, he apologized.

The beating left Davila with stomach pain. In March 2007, Davila went with her mother to the doctor, who informed her that she had been pregnant. The doctor told her that the blows to her stomach had led to the death of her two-month-old fetus, and that she urgently needed an operation due to infection. The doctor removed her dead fetus and performed a hysterectomy. A day after the surgery, Cevilla visited Davila, "supposedly . . . very worried."

A month later, the abuse resumed. Cevilla, drunk again, slapped Davila in the face, hit her stomach, and threw her down, saying it was her fault she had lost the baby. The beatings became more regular, escalating to about twice a month. Cevilla began raping her. Cevilla threatened that if Davila left him, he would harm her son.

During one night of abuse, a next-door neighbor yelled to Davila, instructing her to call the police or else Cevilla would kill her. Davila called the police several times but got no answer. She continued to call, and eventually someone answered and sent two officers. Davila watched as Cevilla went out to meet them, talked with them, and gave them money in the form of bills. The officers left without speaking to Davila. After that, "[i]t was worse," Davila testified. Cevilla taunted Davila, handing her the phone and saying "'go ahead, call the police, call them.'" Davila testified: "He knew that he paid the police off and he knew that . . . I couldn't do anything." While Cevilla was at work the next day, Davila went to a neighbor's and called her mother, telling her about the incident. Davila did not attempt to call the police again.

The abuse continued for years. Cevilla did not allow Davila to work. She had no money of her own. She had no friends. Davila testified: "It was like a hell. . . . I was always locked inside, no telephone. But . . . my son [Yadher] lived with us and [Cevilla] paid for my son's education. . . . I just lost all my willpower. I just felt like I didn't know what to do."

In 2012, Davila's mother made several attempts to locate Yadher's father. Her mother eventually contacted him and explained Davila's situation, telling him that Yadher's life

was in danger and that Davila needed help. The father, who had been in Switzerland, returned to Nicaragua and took Yadher to stay with his family. The same day, Davila left Cevilla and traveled by bus to her mother. Knowing that Cevilla would come look for her at her mother's house, Davila stayed with her mother's neighbor. Indeed, her first night there, Cevilla went to her mother's house, kicking the door and searching the house for Davila. Cevilla returned several different times, "pound[ing] on the door [and] scream[ing] at people," looking for Davila.

After evading Cevilla for two months, Davila needed money, and found work in a small restaurant. Two weeks later, Cevilla came to the restaurant. He pulled Davila out by her arm, took her to a motel, and beat and raped her. He told her that she had to come back to him, and that if she did not he would kill her. While Cevilla was showering, Davila escaped.

Davila quit her job at the restaurant but sought other jobs. However, Davila testified, "Whenever I found another job, he'd always go to the job. . . . He would scream in front of people that [I] was [a] filthy prostitute. And I was so embarrassed, I couldn't go back to those places." Every time Cevilla found Davila, he took her to a hotel, beat her, and raped her.

Davila endured this for two years. Her son, Yadher, visited her intermittently. During one of those visits, Cevilla found them and demanded that Davila leave with him. Davila refused. Standing next to Yadher, who was watching television, Cevilla drew a knife. Over protestations from Yadher, Davila left with Cevilla. Davila testified:

> He took me to the motel that night. He beat me up like never before. He raped me many different ways, and then he threw me out into the street. He left me out on the street at dawn, and I was beaten up like nothing. When I got to the house, my mother saw my — I was bleeding all over the place. She said, that's too much, dear. My mother said she didn't know what to do. She was desperate. . . . My mother is the one that decided to get me out of the country. She preferred to see me far away than see me dead.

Davila's mother then "made it her business to send" Davila to the United States. She mortgaged her home to pay for a smuggler to transport Davila to the border.

On February 20, 2015, Davila left Nicaragua. She presented herself at the Port of San Ysidro on March 3, 2015. Cevilla continued to harass Davila's family, looking for her and throwing rocks at her mother's house. Cevilla now knows that Davila is in the United States and is "waiting for [her] to go back." Davila's brother, who works with Cevilla, also harasses their mother about Davila's whereabouts. Davila testified that she fears that if she is sent back to Nicaragua, "they will kill me."

## B.  Procedural History

On April 1, 2015, the Department of Homeland Security served Davila with a Notice to Appear ("NTA"), charging her with removability for seeking admission without valid entry

documents. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I).[1] At a removal hearing on May 6, 2015, Davila conceded removability. On June 10, 2015, Davila timely filed for asylum, withholding of removal, and relief under CAT. Davila testified in support of her application on July 8, 2016.

On October 17, 2016, the IJ issued a written decision denying Davila's application. The IJ concluded that Davila had credibly testified. As to asylum, he concluded that she had not shown persecution on account of membership in a particular social group. The IJ rejected her proposed social group of "women in domestic relationships who suffer domestic violence and cannot escape abuse in their country." The IJ questioned whether the Nicaraguan government was unable or unwilling to control her past persecution. He found that the abuse Davila suffered was motivated by Cevilla's jealousy and alcohol consumption, as opposed to Davila's membership in a particular social group. The IJ also found that Davila could not establish a well-founded fear of future persecution because her fear was "not objectively reasonable" due to Nicaragua's "willingness to assist victims of rape and domestic violence." Because Davila had not shown eligibility for asylum, the IJ further concluded that she necessarily failed to meet the more demanding standard for withholding of removal. As to relief under CAT, the IJ found Davila ineligible because she did not establish that it was more likely than not she would be tortured by, or with the acquiescence of, a Nicaraguan public official.

---

[1] The NTA also included an allegation that Davila presented a counterfeit visa and a corresponding removability charge under 8 U.S.C. § 1182(a)(6)(C)(i). The government withdrew both.

On appeal, the BIA wrote that Nicaragua had made improvements in protecting women and, "[u]nder these circumstances, and considering all relevant evidence," agreed with the IJ that Davila had not shown that the Nicaraguan government was or would be unable or unwilling to protect her from her claimed persecution. On that ground, the BIA affirmed the denial of Davila's applications for asylum and withholding of removal. Similarly, the BIA affirmed the denial of CAT relief on the ground that she had not shown she would be tortured in Nicaragua by, or with the consent or acquiescence of, a public official. The BIA did not reach any other question.

## II. Standard of Review

Our review is limited to the BIA's decision except where the IJ's opinion is expressly adopted. *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000). We review legal conclusions de novo. *Id.* We review for substantial evidence the factual findings underlying the BIA's determination that a petitioner is not eligible for asylum, withholding of removal, or CAT relief. *Id.*; *Vitus v. Holder*, 723 F.3d 1056, 1062 (9th Cir. 2013). To prevail under the substantial evidence standard, the petitioner "must show that the evidence not only supports, but compels the conclusion that these findings and decisions are erroneous." *Cordon-Garcia*, 204 F.3d at 990.

## III. Discussion

### A. Asylum and Withholding of Removal

An applicant for asylum and withholding of removal bears the burden of establishing eligibility. 8 U.S.C.

§§ 1158(b)(1)(B)(i), 1229a(c)(4)(A). To be eligible for asylum, the applicant must show that "(1) [her] treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010); *see also Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018) ("To be eligible for asylum, [the petitioner] must establish that he is a refugee . . . ."); 8 U.S.C. § 1101(a)(42)(A) (defining a refugee as someone who is unable or unwilling to return to their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion"). "If a noncitizen establishes past persecution, a rebuttable presumption of a well-founded fear arises, and the burden shifts to the government to demonstrate that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear." *Ming Dai*, 884 F.3d at 867 (internal quotation marks and citations omitted). An applicant who fails to satisfy the lower standard for asylum necessarily fails to satisfy the more demanding standard for withholding of removal, which involves showing by a "clear probability" that the petitioner's life or freedom would be threatened in the proposed country of removal. *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004); 8 U.S.C. § 1231(b)(3)(A).

The BIA agreed with the IJ that Davila had not shown that the Nicaraguan government was or would be unable or unwilling to protect her from her persecutor, and that she was therefore ineligible for asylum. The BIA noted that Davila had never reported to "the authorities" the bribe Cevilla made

to the police officers who had finally responded to her repeated calls; had never again attempted to call the police; and had never attempted to obtain a restraining order against Cevilla. The BIA further noted that while evidence indicated "domestic violence remains a problem, the government of Nicaragua has made positive strides in protecting women." According to the BIA, the Nicaraguan government has criminalized rape and "investigate[s] and help[s] prosecute criminal complaints."

Substantial evidence does not support the BIA's conclusion. Davila credibly testified that Cevilla paid off the police officers that responded to her call. Those officers left without speaking to Davila. Cevilla then beat her with particular severity as punishment for calling the police. Davila testified that she did not make additional attempts to contact the police because her first one had so utterly failed, and because she reasonably believed any further calls would have the same result: "I called the police once, and from then on I just resigned to keep taking it because they didn't help me."

Davila testified to a general awareness that the Nicaraguan police did not respond to reports of domestic violence: "The police in my country, they don't do anything. . . . It happens all the time, you know, aggression against women." Davila testified that no one called the police when Cevilla dragged her out of her job at the restaurant. She testified about the corruption rife among police officers, explaining why she had not filed for a restraining order: "The law exists, but the law is not for the poor people. It's only for the people who have money. In my country, justice is for sale." Cevilla was relatively wealthy, working for his father who owned several hotels. Davila had no money of her own,

and she testified that her mother also did not have a lot of money:  "We're poor."

Other evidence corroborated the indifference of Nicaraguan public officials toward domestic abuse.  Davila testified that her brother has physically attacked her mother multiple times.  Her mother filed a police report, but the police "told her that because she didn't have serious injuries they weren't going to do anything."  The Nicaragua Country Report from the U.S. State Department notes that while the law criminalizes "all forms of rape," "[t]he government failed to enforce the law effectively, . . . leading to widespread impunity and increased violence."  The Country Report also states that "[m]any women were reluctant to report abuse due to," among other things, "impunity for perpetrators," and that while "the law provides for the issuance of restraining orders, problems in the effective enforcement of such mandates continued, and they were not perceived as effective."  A June 2016 news article in the record reported that some thirty Nicaraguan women were killed between January and May of that year "at the hands of their partners or acquaintances," with the perpetrators going unpunished.  Another June 2016 article in the record quoted Ana Orozco Evelyn Andrade, a lawyer and member of the Nicaraguan Initiative for Human Rights Defenders of Women, as saying that while reported "femicides" were down in 2015 compared to 2014, "it is not an objective reality" because "so many are not reported."

In rejecting Davila's claim, the BIA focused on the "positive strides" Nicaragua had made in protecting women and on the fact that the country criminalizes rape, citing the State Department Country Report.  The BIA also noted that the Nicaraguan National Police can provide social and legal help to women.  "Under these circumstances," the BIA wrote,

Davila had not demonstrated that the Nicaraguan government was unable or unwilling to protect her. However, the BIA cited the Country Report selectively. For example, it cited Nicaragua's criminalization of rape and domestic violence while ignoring information in the same paragraph about the failure of the government to enforce the law and the resulting "widespread impunity." It cited Nicaragua's provision for restraining orders while ignoring information in the same sentence about "problems in the effective enforcement of such mandates."

The BIA was required to evaluate all relevant evidence in the record to determine whether Davila had carried her burden. *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1069 (9th Cir. 2017) (en banc) (noting that relevant evidence includes Country Reports). However, the BIA's extreme selectivity in using the Country Report evidence belies any attempt to do so.

The BIA also erred when it faulted Davila for failing to contact the police again and for failing to report Cevilla's bribe. As we explained in *Bringas-Rodriguez*, "[w]hether a victim has reported or attempted to report violence or abuse to the authorities is a factor that may be considered, as is credible testimony or documentary evidence explaining why a victim did not report." *Id.* But it was error for the BIA to *require* Davila to make an additional report of subsequent abuse. *Id.* at 1066 n.9 (describing "our rule that reporting is not required"). It was also error to disregard Davila's credible testimony about why she did not report subsequent abuse after the first report was disregarded, as that is "tantamount to making the reporting of private persecution a sine qua non for the success of [his or her]" claim. *Id.* at 1065–66 (internal quotation marks omitted); *see also*

*Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006) ("[A]n applicant who seeks to establish eligibility for with-holding of removal under section 1231(b)(3) on the basis of past persecution at the hands of private parties the government is unwilling or unable to control need not have reported that persecution to the authorities if he can convincingly establish that doing so would have been futile or have subjected him to further abuse."). Here, not only did Davila actually report her persecution, but she also provided credible testimony and documentary evidence about why she did not make any further reports and about the more severe abuse that followed her sole report. Davila has more than satisfied her burden under our precedent. *See, e.g.*, *Andriasian v. INS*, 180 F.3d 1033, 1042–43 (9th Cir. 1999) (holding, where petitioner reported his persecution once, government unwillingness or inability to protect "clearly establish[ed]"); *Korablina v. INS*, 158 F.3d 1038, 1044–45 (9th Cir. 1998) (holding, where petitioner did not report persecution but credibly testified that police were uninterested in protecting Jews, government unwillingness or inability to protect).

In sum, we hold that the record, considered as a whole, does not provide substantial evidence for the BIA's conclusion that the Nicaraguan government was willing and able to protect Davila.

The BIA did not address whether Davila belonged to a cognizable particular social group, was persecuted on account of her membership in that social group, or had a well-founded fear of future persecution. We remand so that the BIA may consider these issues for the first time.

## B.  CAT

We conclude for similar reasons that substantial evidence did not support the BIA's determination that Davila had failed to show that the Nicaraguan government consented to or acquiesced in her torture for the purpose of CAT relief. For withholding of removal under CAT, Davila must show that it is "more likely than not that . . . she would be tortured if removed" to Nicaragua.  8 C.F.R. § 208.16(c)(2).  Torture is defined as any act that intentionally inflicts "severe pain or suffering" on a person for the purposes of obtaining information or a confession; punishment; intimidation; coercion; or discrimination.  *Id.* § 208.18(a)(1).  Torture is "more severe than persecution."  *Guo v. Sessions*, 897 F.3d 1208, 1217 (9th Cir. 2018).  "In addition, the torture must be inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014) (internal quotation marks omitted); 8 C.F.R. § 208.18(a)(1).  An applicant for CAT relief need not show that she will be tortured on account of any particular ground.  *Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011).

The BIA concluded that Davila was ineligible for CAT because she failed to show that it was more likely than not she would be tortured in Nicaragua by, or with the consent or acquiescence of, a public official.  The BIA reiterated in support of its holding that Nicaragua had made "positive strides in protecting women" and that the Nicaraguan National Police can provide social and legal help to women. This reasoning suffers from the same flaws as above. Accordingly, we hold that substantial evidence did not support the BIA's determination that Davila failed to show that sufficient state action was involved in her torture.  *See*

*Garcia-Milian*, 755 F.3d at 1033.  We remand so that the agency may consider for the first time whether Davila's abuse rose to the level of torture, and whether it is more likely than not that she would be tortured upon removal to Nicaragua.

## Conclusion

Davila has shown the Nicaraguan government's unwillingness or inability to address the abuse she suffered at the hands of Cevilla, as well as the government's acquiescence in that abuse.  We remand so that the BIA may consider whether Davila's abuse rose to the level of persecution; whether she belongs to a cognizable particular social group; whether her persecution was on account of her membership in said social group; whether her abuse rose to the level of torture; and whether it is more likely than not she would be tortured if returned to Nicaragua.

   **Petition GRANTED and REMANDED.[2]**

---

   [2] Davila has moved for summary grant of her petition on the ground that her original NTA did not specify a hearing date or time and therefore did not properly vest the IJ or BIA with jurisdiction over her case.  Dkt. Entry No. 21.  This motion is **DENIED.**  *See Karingithi v. Whitaker*, 913 F.3d 1158, 1160 (9th Cir. 2019).