**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BRISEYDA MEZA DIAZ;
GABRIELA SEGUNDO MEZA,

*Petitioners*,

v.

MERRICK B. GARLAND, Attorney
General,

*Respondent*.

No. 23-973

Agency Nos.
A209-390-110
A209-390-111

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted July 18, 2024[*]
Pasadena, California

Filed October 8, 2024

Before: Kim McLane Wardlaw, Richard A. Paez, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Paez

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Immigration

The panel granted Briseyda Meza Diaz's petition for review of the Board of Immigration Appeals' decision affirming the denial of asylum and withholding of removal, holding that the record evidence compelled the conclusion that Meza Diaz experienced past persecution committed by forces that Mexican authorities are either unable or unwilling to control, and that the BIA legally erred by failing to consider highly probative evidence regarding a nexus between the harm and a protected ground.

The panel concluded that the harms Meza Diaz and her family suffered, including murder, physical assault, kidnapping, a home invasion during which petitioner was beaten unconscious, and specific, years-long death threats, clearly rise to the level of persecution.

The panel held that in concluding that Meza Diaz failed to establish a nexus between the harm she suffered and her family status the agency erred by failing to consider key evidence, including Meza Diaz's attackers' statements and additional evidence contained in a police report.

Meza Diaz also presented compelling evidence indicating that the police were either unable or unwilling to control her persecutors. First, contrary to the agency's statements otherwise, Meza Diaz provided police with information regarding her attackers' identities, including the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

history of the harm she and her family experienced that, at minimum, should have provided a starting point for an investigation. Moreover, although the police assisted Meza Diaz's family and allowed her to file a report, the police official's admonition that authorities could not ensure her safety and that she should therefore flee the country demonstrated that Mexican officials were, in fact, either unable or unwilling to protect her. Other record evidence also corroborated that Mexican officials are either unable or unwilling to protect their citizens from cartel violence.

The panel remanded for further proceedings on Meza Diaz's claim of future persecution.

---

**COUNSEL**

Mardy M. Sproule, Law Offices of Mardy M. Sproule, Whittier, California, for Petitioners.

Nancy Pham, Attorney; Madeline Henley, Trial Attorney; Corey L. Farrell, Senior Litigation Counsel; Brian M. Boynton, Principal Deputy Attorney General, Civil Division; Office of Immigration Litigation, Washington, D.C.; for Respondent.

# OPINION

PAEZ, Circuit Judge:

Petitioner Briseyda Meza Diaz ("Meza Diaz") and her minor daughter, Gabriela Segundo Meza ("GSM"), fled Mexico after suffering a home invasion by hooded, armed men who held a weapon to Meza Diaz's head, told her that she was going to die, and then beat her unconscious. The home invasion followed years of death threats received by Meza Diaz after her brother was murdered and her husband was abducted. When Meza Diaz went to the local police to report the threats and beating, they told her that they could not protect her and encouraged her to flee the country, even offering her a ride to the airport. Meza Diaz and GSM fled Mexico the next day out of fear for their safety. They presented themselves to authorities at the United States border and sought asylum and other relief.

When Meza Diaz and GSM sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), an Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") determined that Meza Diaz's past experiences in Mexico did not rise to the level of persecution.[1] They also determined that Meza Diaz and GSM did not establish a well-founded fear of future persecution. The IJ and BIA therefore denied all forms of relief and ordered Meza Diaz and GSM removed.

---

[1] Meza Diaz included GSM as a derivative beneficiary of her asylum application. GSM did not file a separate application for relief. We accordingly remand GSM's claims as a beneficiary of Meza Diaz's application. *See* 8 U.S.C. § 1158(b)(3)(A).

Meza Diaz petitions for review of the BIA's denial of her appeal of the IJ's decision. We conclude that the record compels a finding that Meza Diaz experienced past persecution by forces that Mexican officials are either unable or unwilling to control. Because the BIA committed legal error in its analysis of nexus, we grant the petition as to Meza Diaz's asylum and withholding claims and remand for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

### A. Experiences in Mexico

Meza Diaz's interactions with the cartel began when she was a minor. In 2000, Meza Diaz's brother, Ismar Arreola Meza, and his grandmother were murdered by cartel members in the Mexican state of Michoacan. At the time, Meza Diaz was seventeen and living with her siblings and mother in Magueyes, Turicato, a town in Michoacan. Following an investigation, authorities in Michoacan charged four individuals with their murders. The individuals were ultimately sentenced to fourteen years in prison for the murders.

Meza Diaz and her family received death threats by phone and by mail following her brother's murder. Meza Diaz's mother initially reported the threats to the police. The police occasionally patrolled the neighborhood for a time, but the threats did not stop. In several conversations, the callers warned Meza Diaz's family that they knew that the family had reported the threats to the police. The callers repeatedly threatened to harm Meza Diaz and her two surviving siblings.

In 2002, as the death threats continued, Meza Diaz and her surviving siblings fled Mexico for the United States out

of fear for their safety. Meza Diaz's mother remained in Mexico.

Meza Diaz's mother stopped receiving death threats in approximately 2005. As a result, Meza Diaz returned to Turicato with her common-law husband, Juan Segundo Villasenor ("Segundo Villasenor"),[2] and their daughters.

A few years after the family returned to Turicato, Segundo Villasenor was abducted and held for two weeks, during which time he was beaten and tortured. Meza Diaz received calls from Segundo Villasenor's abductors demanding that she pay them approximately 250,000 pesos or else they would kill her husband. The callers referred to Meza Diaz by name and threatened her with death. One of her husband's captors warned her, "We already know that you are Is[]mar's sister. So, give us the money if you don't want the same that happened to him to happen to you." The abductors also told Meza Diaz that they would kill her husband and kidnap one of her daughters if she reported the abduction to the police. Meza Diaz eventually paid the ransom amount and Segundo Villasenor was released. Meza Diaz found him on the side of the road, with a hood over his head, beaten and unconscious.

The abductors continued to threaten the family with death after Segundo Villasenor's release. One caller told her, "We are the one[s] that ordered the murder of your [] brother." Meza Diaz testified that she did not report the abduction or the death threats because the abductors had threatened to harm Segundo Villasenor and her daughters if she went to the police for help.

---

[2] Meza Diaz and Segundo Villasenor are not legally married but refer to each other as husband and wife.

A few months after the abduction, Segundo Villasenor fled Mexico for the United States out of fear for his safety. After Segundo Villasenor left, Meza Diaz continued to receive threats from his abductors. She testified that the callers were particularly angry because one cartel member had been detained by police. Fearing for her daughters' safety, Meza Diaz sent her eldest two daughters, who are both U.S. citizens, to live with Segundo Villasenor in the United States. Her youngest daughter, GSM, is a Mexican citizen and thus remained with Meza Diaz in Michoacan.

On September 5, 2016, Meza Diaz and GSM were at home when a group of armed and hooded individuals suddenly entered their home. One of the men placed a weapon to Meza Diaz's head and told her "your time has come" and that she was going to die. She was then beaten unconscious. The attackers informed her that she had three days to pay them one million pesos or they would kill her and her daughter. The attackers also hid GSM from Meza Diaz in the home.

Meza Diaz tried to file a police report immediately after the attack. The police took her report but informed her that they could not guarantee her safety and recommended that she flee Mexico. Meza Diaz testified that the police feared that the same people who had threatened and attacked her would return if she did not leave. The police drove Meza Diaz and GSM to the airport in a patrol car the following day.

Meza Diaz and GSM entered the United States on September 9, 2016, at the port of entry in San Ysidro, California. Upon arrival, she presented the police report that she had filed days earlier to the border patrol authorities. They were placed in removal proceedings on February 6,

2017.   Meza Diaz applied for asylum, withholding of removal, and CAT relief in May 2017.  As noted above, GSM was listed as a beneficiary of her mother's asylum application.  Since arriving in the United States, Meza Diaz has resided in Southern California with Segundo Villasenor and their daughters.

## B.  Administrative Proceedings

Meza Diaz testified before an IJ in July 2019, where the IJ considered the merits of her application for asylum, withholding of removal, and protection under CAT.  Meza Diaz sought asylum and withholding of removal because she claimed that she suffered persecution on account of her membership in several particular social groups ("PSG"), including "immediate family of Ismar Arreola Meza" and "member[s] of the Meza family from Magueyes, Turicato." Meza Diaz was the only witness who testified at the hearing. At the end of the hearing, the IJ issued an oral decision denying Meza Diaz's application for asylum, withholding of removal, and CAT relief, and ordering her and GSM removed to Mexico.

The IJ found Meza Diaz credible but determined that the 2016 home invasion and death threats did not rise to the level of past persecution.  The IJ also found that the home invasion was an isolated incident that was not related to her family's history with the cartel.

Next, the IJ determined that Meza Diaz had not demonstrated that her past harm had been inflicted by forces the Mexican government was unable or unwilling to control. The IJ noted that Michoacan authorities successfully prosecuted her brother's murderers in 2000, and police officials took some action when her mother reported death threats.  The IJ concluded that because Segundo Villasenor's

kidnapping was never reported to police, it was impossible to determine whether the government would have assisted in an investigation. Finally, the IJ determined that the police responded reasonably to Meza Diaz's attempt to report the home invasion because she provided no evidence of the assailants' identities.

Meza Diaz timely but unsuccessfully appealed the IJ's decision to the BIA. The BIA found no clear error in the IJ's determination that Meza Diaz was not entitled to asylum, withholding of removal, or CAT relief. The BIA affirmed the IJ's determination that Meza Diaz did not suffer past persecution and failed to establish a well-founded fear of future persecution. The BIA further concluded that, even if Meza Diaz had suffered past persecution, she failed to demonstrate that the mistreatment occurred on account of a protected ground and by forces that Mexican officials were either unable or unwilling to control. The BIA noted that "the police's actions following the [] 2016 attack by hooded individuals are insufficient to satisfy [Meza Diaz's] burden of proof" because "[a]uthorities are not required to solve all crimes for the government to be considered able and willing to control the persecutors."

Meza Diaz timely petitioned for review.

## II.  Jurisdiction and Standards of Review

"Where the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012) (citation and quotation marks omitted). Because the BIA here dismissed Meza Diaz's appeal, agreeing with the IJ's findings and added its

own reasoning, we review both the BIA's decision and the portions of the IJ's decision adopted by the BIA. *Id.*

"We review factual findings for substantial evidence and legal questions de novo." *Guerra v. Barr*, 974 F.3d 909, 911 (9th Cir. 2020). Where the BIA does not consider all the evidence before it, either by "misstating the record [or] failing to mention highly probative or potentially dispositive evidence," its decision is legal error and "cannot stand." *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2011).

## III. Discussion

### A. Asylum

To be statutorily eligible for asylum, Meza Diaz must show that she is a refugee. 8 U.S.C. § 1158(b)(1). A refugee is one who is "unable or unwilling to avail himself or herself of the protection of [her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). An applicant alleging past persecution bears the burden to establish that: "(1) h[er] treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010). "Persecution is defined as 'the infliction of suffering or harm . . . in a way regarded as offensive.'" *Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1313 (9th Cir. 2012) (quoting *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc)). "Either past persecution or a well-founded fear of future persecution provides eligibility for a discretionary grant of asylum." *Ratnam v. INS*, 154 F.3d 990, 994 (9th

Cir. 1998).  An individual "who establishes past persecution is presumed to have a well-founded fear of persecution."  *Id*. (citation omitted).

### 1. Past Persecution

Meza Diaz argues that she suffered past persecution and has a well-founded fear of future persecution based on her brother's murder, her husband's kidnapping, the years of death threats she received, and the home invasion in which her attackers beat her unconscious.  The BIA determined that these experiences did not constitute past persecution. Substantial evidence does not support this conclusion.

The harms that Meza Diaz and her family suffered— murder, physical assault, kidnapping, a home invasion, and specific, years-long death threats—clearly rise to the level of persecution under our precedents.  *See Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018).  Meza Diaz was beaten unconscious, which we have held is "'clearly' sufficient to show past persecution."  *Id*. (brackets omitted) (quoting *Gafoor v. INS*, 231 F.3d 645, 650 (9th Cir. 2000)).  We have "consistently held that petitioners whose family members have been murdered—particularly when the petitioners themselves have also suffered physical injury—have suffered persecution."  *Id*. at 909–10 (citing *Rios v. Ashcroft*, 287 F.3d 895, 900 (9th Cir. 2002)); *see also Salazar-Paucar v. INS*, 281 F.3d 1069, 1075 (9th Cir. 2002) ("[E]vidence of harm to Petitioner's family supports a finding of past persecution.").  And we have "repeatedly held that threats may be compelling evidence of past persecution, particularly when they are specific and menacing and are accompanied by evidence of violent confrontations, near-confrontations and vandalism."  *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004).

That these events occurred over a span of sixteen years does not diminish the fact that Meza Diaz's mistreatment rose to the level of persecution. *See Ahmed v. Keisler*, 504 F.3d 1183, 1194 (9th Cir. 2007) (holding that although petitioners were "victimized at different times over a period of years," the continued harm further supported a finding of persecution); *see also Chand v. INS*, 222 F.3d 1066, 1070–74 (9th Cir. 2000) (petitioner suffered past persecution where he was the victim of violence three times, repeatedly robbed over the course of a few years, and had his house vandalized and his belongings stolen).

Meza Diaz suffered significant physical violence. The home invasion and beating were part of a pattern of mistreatment that included years of death threats, the abduction and torture of her husband, and the murder of her brother. *See Sharma v. Garland*, 9 F.4th 1052, 1061–63 (9th Cir. 2021) (explaining that, in determining whether treatment rises to the level of persecution, courts must consider the cumulative effect of all the incidents that a petitioner has suffered, including serious physical violence, an ongoing pattern of serious mistreatment, detention, and harm to family members).

Meza Diaz fled Mexico twice in response to specific and menacing death threats: first, at age nineteen, after she and her siblings were threatened with death after reporting the threats to the police, and again, after escalating death threats and a violent attack during a home invasion in which she was beaten unconscious. These events, combined with her brother's murder and her husband's abduction, compel a finding of past persecution. Our decision in *Flores Molina v. Garland*, 37 F.4th 626 (9th Cir. 2022), "makes clear that, where 'repeated incidents in which [the petitioner] fled were each 'in the face of an immediate threat of severe physical

violence or death,' those incidents 'rise to the level of persecution.'" *Singh v. Garland*, 57 F.4th 643, 653 (9th Cir. 2023) (quoting *Flores Molina*, 37 F.4th at 634). Under our precedent, the harms that Meza Diaz experienced in Mexico rise to the level of persecution. Thus, the BIA's threshold determination that Meza Diaz did not suffer past persecution is not supported by substantial evidence.

### 2. Nexus

We next address the agency's nexus determination—that is, whether Meza Diaz's persecution was "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The IJ and BIA determined that Meza Diaz did not suffer past persecution on account of her membership in the cognizable PSGs of "immediate family of Ismar Arreola Meza" and "member[s] of the Meza family from Magueyes, Turicato."[3] In so concluding, the agency committed legal error by failing to consider record evidence of a nexus between Meza Diaz's past harm and her family status.

The BIA determined that Meza Diaz "did not present evidence tying her attack in 2016 to the prior events that occurred 8 and 16 years earlier, respectively." The BIA agreed with the IJ's determination that "the 2016 attack on [Meza Diaz and GSM] was not related to their familial relationship with [Meza Diaz's] brother" and that "the evidence demonstrates that despite having been threatened for many years, [Meza Diaz and GSM] have never been

---

[3] Because we agree with the BIA that Meza Diaz's proposed PSGs of "immediate family of Ismar Arreola Meza" and "member[s] of the Meza family from Magueyes, Turicato" are cognizable, we do not address Meza Diaz's other proposed PSGs or her imputed political opinion claim.

harmed by anyone involved in the murder of [Meza Diaz's] brother."

In making that determination, the IJ and the BIA ignored key record evidence: the police record of the report that Meza Diaz made immediately after the home invasion and attack. The report contained the attackers' statement to Meza Diaz that "your time has come" and that she was going to die. The attackers' statement that Meza Diaz's "time ha[d] come" links the home invasion and attack to the numerous death threats Meza Diaz received after her brother's murder and husband's kidnapping. Several of those death threats were made by callers who told Meza Diaz that they knew she was Ismar's sister and that she did not want to meet his fate—namely, being murdered. The police report also notes that Ismar's murderers were recently released from prison. And the report summarizes Meza Diaz's family history, including her brother's murder, her husband's kidnapping, and the death threats and extortion attempts that Meza Diaz suffered after both events.

Although Meza Diaz properly submitted this evidence to the agency, it failed to give reasoned consideration to that evidence. Meza Diaz included the attackers' "your time has come" statement and presented the original and translated versions of the police report in support of her asylum application. But the police report was barely discussed at Meza Diaz's hearing, the BIA's decision did not mention it, and the IJ's oral decision made one passing reference to it— that Meza Diaz had reported her brother's death to the police. The IJ's oral decision does contain boilerplate language that "[a]ll of the evidence in the record have [sic] been considered whether or not specifically mentioned in this oral decision, and given the appropriate weight in the rendering of the Courts [sic] decision in these matters." But

given the record in this case, we do not attach any significance to that statement. *See Cole*, 659 F.3d at 771–72 ("[W]here there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice . . . ."). In concluding that Meza Diaz had not presented any evidence of a link between the home invasion and her family history, the agency failed to consider the attackers' statement or the additional evidence presented in the police report in making its nexus determination.

This was legal error. "Where the BIA fails to consider highly probative record evidence, its 'decision cannot stand.'" *Flores Molina*, 37 F.4th at 638 (quoting *Cole*, 659 F.3d at 771–72); *see also Castillo v. Barr*, 980 F.3d 1278, 1284 (9th Cir. 2020). While the agency is "not require[d] . . . to discuss every piece of evidence" in its discussion of past persecution and nexus, *Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006), remand is required "where there is any indication that the BIA did not consider all of the evidence before it." *Cole*, 659 F.3d at 771–72. "Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence." *Id*. at 772. Here, the agency's assertions that there was no evidence connecting the home invasion to Meza Diaz's family history and death threats shows that it failed to consider the report in making its nexus determination. Thus, its decision cannot stand. *See Castillo*, 980 F.3d at 1284.

Because the BIA failed to consider record evidence when it concluded that Meza Diaz did not suffer past persecution on account of her family status, we grant the petition and remand for the agency to consider this evidence in its reconsideration of her application for asylum and withholding of removal. *See id*. at 1283–84; *see also*

*Sumolang v. Holder*, 723 F.3d 1080, 1083–84 (9th Cir. 2013).

### 3.   Unable or Unwilling

The IJ and BIA determined that Meza Diaz had not met her burden of establishing that her past harm was on account of forces that the Mexican government was either unable or unwilling to control.   8 U.S.C. § 1101(a)(42)(A).   In "instances of police failure to respond to a report of persecution, we have held that a petitioner need not provide evidence that a government is 'unable or unwilling to control persecution on a countrywide basis.'" *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1063 (9th Cir. 2017) (en banc) (international quotation marks and brackets omitted) (quoting *Mashiri v. Ashcroft*, 383 F.3d at 1122).   "Instead, an asylum applicant may meet her burden with evidence that the government was unable or unwilling to control the persecution in the applicant's home city or area." *Mashiri*, 383 F.3d at 1122.   Meza Diaz presented compelling evidence demonstrating that government officials are unable or unwilling to control her persecutors.   We therefore conclude that this determination is not supported by substantial evidence.

The day after the home invasion and attack, Meza Diaz went to the police station for assistance.   The police allowed her to file a report but told her that they could not further assist her and could not guarantee her safety.   Officers recommended that Meza Diaz flee Mexico to the United States and offered to drive her to the airport.   An officer then drove Meza Diaz and GSM to the airport in a patrol car.   The police gave her a copy of the police report to present to U.S. immigration authorities.   The report reflects that Meza Diaz is fleeing Mexico "to safeguard the physical integrity of her

family." The end of the report includes a direct message to U.S. immigration authorities from the issuing police officer, who wrote: "This instance of the municipal government, I address the immigration authorities of the U.S. [to] respectfully to seek assistance and support for the family in question."

The BIA concluded that Meza Diaz had not demonstrated that her past harm was committed by forces that the Mexican government is unable or unwilling to control because she provided no information regarding the attackers' identities. The BIA agreed with the IJ's determination that, "according to the evidence, there is no information as to who these individuals were, what their identities were. And so, it is unclear what more the authorities in Mexico could have done, but at the very least they did take the report." The BIA added that "[a]uthorities are not required to solve all crimes for the government to be considered able and willing to control the persecutors."

But Meza Diaz did, in fact, provide police with information about her attackers' identities—she told them about all of the harms that she and her family had experienced. The police report recounts Meza Diaz's brother's murder and her husband's kidnapping, and notes that her brother's murderers were released from prison just five months before the home invasion. The report states that Meza Diaz received targeted "death threats and harassment" after both her brother's murder and her husband's kidnapping. And, as discussed above, the report reflects that Meza Diaz informed the police about her attackers' "your time has come" statement during the home invasion.

This information that Meza Diaz gave to the police, as documented in the police report, provided them with—at a

minimum—a place to begin their investigation. But although Meza Diaz provided the police with significant information regarding who might have a motive to harm her, the police explicitly told her that they could not guarantee her safety and recommended that she flee the country.

Meza Diaz presented compelling evidence indicating that the police were either unable or unwilling to control her persecutors. The BIA made much of the fact that the police allowed her to file a report, of which they provided her a copy, and drove her to the airport in a patrol car. But a copy of a police report and a ride to the airport after urging a citizen to flee the country falls far short of a willingness or ability to control that citizen's persecutors. "Some official responsiveness to complaints of violence, although relevant, does not automatically equate to governmental ability and willingness." *J.R. v. Barr*, 975 F.3d 778, 782 (9th Cir. 2020). Our precedent makes clear that "'[e]ven if an applicant's ability to file a police report suggests that the police were *willing* to protect [her], that says little if anything about whether they were *able* to do so.'" *Id*. (emphasis in original) (brackets omitted) (quoting *Afriyie v. Holder*, 613 F.3d 924, 931 (9th Cir. 2010), *overruled on other grounds by Bringas-Rodriguez*, 850 F.3d at 1070).

The explicit admission by the police that they could not ensure Meza Diaz's safety must be given substantial weight because "the question on this step is whether the government both '*could* and *would* provide protection.'" *Id*. (quoting *Rahimzadeh v. Holder*, 613 F.3d 916, 923 (9th Cir. 2010)); *see also Bringas-Rodriguez*, 850 F.3d at 1069 ("[O]ur law is clear that the agency . . . must examine all the evidence in the record that bears on the question of whether the government is unable or unwilling to control a private persecutor."). Even though the police assisted Meza Diaz's

family in 2000 and allowed her to file a report in 2016, the police official's admonition that authorities could not ensure her safety and that she should therefore flee the country demonstrates that Mexican officials were, in fact, either unable or unwilling to protect Meza Diaz. *See J.R.*, 975 F.3d at 783–84.

Other record evidence corroborates that Mexican officials are either unable or unwilling to protect their citizens from cartel violence. Country conditions reports reflect that police departments in Mexico, particularly at the state and local level, have failed to combat organized crime, and are in some cases working in concert with cartels to protect cartel members involved in deadly violence. The state of Michoacan has been particularly unable to stem violence perpetrated by organized crime, and the state suffers from high rates of kidnapping, extortion, and violence against women, including sexual torture.

Thus, "[t]he undisputed factual record that was before the IJ and BIA reflects actual deadly violence that the government was, during certain periods, unable to control, and threats of additional deadly violence that the government was entirely unwilling to control . . . ." *Id.* at 784; *see also Davila v. Barr*, 968 F.3d 1136, 1142–43 (9th Cir. 2020). And "[o]ur law does not require applicants to wait until gang members carry out their deadly threats before they are eligible for asylum." *J.R.*, 975 F.3d at 784. Significant evidence in the record thus "calls into doubt the Mexican government's ability to control" Meza Diaz's persecutors. *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013).

In sum, applying our caselaw to the record evidence, we conclude that any reasonable adjudicator would be compelled to conclude that Meza Diaz suffered past

persecution by forces that the Mexican government is either unable or unwilling to control. *See Flores Molina*, 37 F.4th at 637. On remand, the BIA must reconsider its determination on the remaining element of past persecution: nexus. "If [Meza Diaz] establishes [nexus], 'a rebuttable presumption of a well-founded fear arises, 8 C.F.R. § 208.13(b)(1), and the burden then shifts to the government to demonstrate that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear.'" *Id*. (brackets omitted) (quoting *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004)).

### 4. Fear of Future Persecution

Meza Diaz also challenges the BIA's determination that she failed to demonstrate a well-founded fear of future persecution. The agency concluded that Meza Diaz and GSM had not shown "a reasonable possibility that they will be persecuted in Mexico based on their membership in their family."

The BIA was "required to evaluate all relevant evidence in the record" to determine whether Meza Diaz carried her burden of establishing a well-founded fear of future persecution. *Davila*, 968 F.3d at 1143 (citation omitted). As discussed above, the BIA failed to consider and meaningfully address key record evidence relevant to nexus, and erroneously concluded that Meza Diaz had not suffered past persecution and had not demonstrated that her harm was committed by forces that the Mexican government is unable or unwilling to control. *See Madrigal*, 716 F.3d at 508. We accordingly grant the petition and remand for further proceedings on Meza Diaz's claim of future persecution. *Id*.; *see also Flores Molina*, 37 F.4th at 638.

## B.  Withholding of Removal

An applicant is entitled to withholding of removal if her "life or freedom would be threatened in [her home] country because of [her] race, religion, nationality, membership in a particular social group, or political opinion."   8 U.S.C. § 1231(b)(3)(A).   The BIA denied Meza Diaz's claim for withholding of removal because it determined she "could not satisfy the requirements for asylum."  Because the BIA erred in its denial of asylum, we remand Meza Diaz's withholding of removal claim for further consideration.  *Flores Molina*, 37 F.4th at 638; *Madrigal*, 716 F.3d at 508.

Moreover, if the BIA determines that Meza Diaz has carried her burden as to nexus, the agency must credit Meza Diaz with a rebuttable presumption of eligibility for withholding of removal.  8 C.F.R § 1208.16(b)(l)(i); *Ahmed*, 504 F.3d at 1199.  Finally, even if the BIA determines that Meza Diaz is not entitled to a presumption of eligibility for withholding of removal, it must consider all probative evidence related to her fear of future persecution.  *See supra* Discussion § III(4).

## IV.  Conclusion

In sum, we grant the petition and hold that (1) the record evidence compels the conclusion that Meza Diaz experienced past persecution committed by forces that Mexican authorities are either unable or unwilling to control, (2) the BIA legally erred by failing to consider highly probative evidence of nexus; and, thus, (3) the BIA's denials

of asylum and withholding of removal are remanded for further consideration.[4]

Petitioner shall recover her costs on appeal.

**PETITION GRANTED AND REMANDED.**

---

[4] Because Meza Diaz did not raise her CAT claim in her opening brief, we deem that claim waived. *Rizk v. Holder*, 629 F.3d 1083, 1091 n.3 (9th Cir. 2011).